Owen, J. I.
The defendant maintains that to entitle the. plaintiff to the certificate of authority to transact its business within this state, it must show that it has a capital of $100,000.. An examination of the various provisions of our statutes upon this subject leads us to the conclusion that a mutual insurance company similar to our own, organized under the laws of another state, which has at least $50,000 in premium notes on which at least $10,000 in cash has been paid before starting its business of insuring, shows itself entitled, so far as this. requirement is concerned, to admission to transact business in this state.
2. A more serious and difficult question is presented by the application of the-plaintiff for a writ of mandamus to compel the defendant to grant to it the certificate of authority provided for by our statutes to transact business within this state.
This involves the inquiries, (1) how far the superintendent of insurance is clothed with discretion in the matter of granting such authority, and (2) how far this court may control the exercise of such discretion by the writ prayed for.
Our statutes nowhere expressly direct the superintendent *106 to grant authority to a foreign insurance company to carry on its business within the state, nor do they otherwise expressly permit such a company to transact its business here.
It is provided (Rev. Stats. § 3656) that such company shall not transact its business within this state until it procure from, the superintendent a certificate of authority to do so. It is true that the provisions of our statute upon this subject were enacted in the light, and upon the assumption, of the settled_ policy of the state to permit foreign companies to do business within it, and we may assume for the purposes of the discussion that a cordial welcome has been extended to such com-. panies of other states as were in unquestionably sound condition to transact their business within the state. But we are dealing with the restraints and limitations which the statutes impose upon the enjoyment of this privilege, which depends more upon the comity of our state than upon its express grant.
It is made the duty of the superintendent of insurance (§ 268, Rev. Stats.) “ to see to the execution and enforeemént of all laws relating to insurance.” It is his duty to keep himself advised of the business and affairs of insurance companies doing business within the state (§§ 269, 272).
If it shall at any time appear to him, upon satisfactory evidence, that an insurance company not organized under the laws of this state, but transacting business within it, is in an “ unsound condition,” it is his duty to revoke the authority granted to such company (§ 277), and from his decision there is no appeal. This supplies a potent argument for the Targe discretion claimed for and by the defendant in the administration of his office. Let it be supposed that upon the plaintiff presenting its application, with all the forms prescribed by statute, "the superintendent entered upon such investigation of its affairs as furnished evidence, satisfactory to him, that it was, in reality, in an unsound condition. "Will it be seriously contended that, notwithstanding this condition of affairs, he had no discretion to withhold his certificate of authority?- The proofs in this case disclose a condition of things, at the time of his refusal, to challenge the serious consideration and scrutiny of the superintendent. The first appearance among us of this *107 company was when, without either an application or an invitation, it in some manner invaded our borders, and, by its own confession, effected insurance in the aggregate sum of $63,550, by policies issued to citizens of Ohio, in defiance of the express provisions of our law against it. Possibly its entire exclusion from the state for this impropriety would be a penalty unwarranted by our law, but the conduct of the plaintiff was, at the very best, a thing to stimulate the vigilance and scrutiny of a faithful superintendent of insurance.
Then, by its own showing made to the superintendent it has received in premiums and assessments since its organization the sum of $104,470.53, up to and including the 31st day of December, 1882. This is all gone — only $40,082.38 having been paid to policy holders for losses ! The superintendent found that the balance was not satisfactorily accounted for. The most satisfactory explanation of this rather eccentric filian-, ciering comes in the form of an argument that as there is “ no evidence tending to show fraud or the unlawful payments of dividends, it is not material to any inquiry involved in this proceeding.”
If it was material to any inquiry which it was proper for the superintendent to make in determining upon the admission or exclusion of this company, it becomes a question of vital concern in this proceeding. We do not hesitate to say, that the superintendent had no power, arbitrarily, or in his mere caprice, to exclude the plaintiff from the state. On the other hand, we do not hesitate to say that if the superintendent, acting in good faith, discovered what fairly justified him in the opinion that the admission of the plaintiff, by reason of its financial showing, was destined to prove a menace to the interests of our citizens, who were likely to be exposed to peril by such admission, there was confided to him such discretion as called upon him to avert the peril by refusing admission to the plaintiff.
To justify the issuing of the writ prayed for, it must appear that it was a plain public duty of the superintendent to grant the authority applied for by the company, and either that he had no discretion to refuse it, or that in the refusal there was *108 an abuse of bis discretion. In other words, it should appear that in such refusal there was a plain dereliction of duty on his part. Ex parte Black, 1 Ohio St. 30. This is not a proceeding to review and reverse the decision of the superintendent. The question is, had he power to decide at all ? If he- had, then, in the absence of fraud, bad faith and gross abuse of discretion, his decision is final; although upon the same evidence this court might have.reached a different conclusion.
If the superintendent was called . upon to perform a plain and specific public duty positively required by law, ministerial in its nature, calling for the use of no discretion nor the exercise of official judgment, his refusal to act would, in the absence of. other means of relief, call for the remedy herein invoked.
But the principle is too firmly established to be questioned, that where a public officer is invested with discretionary power concerning the performance of a public duty required at his hands, or, .wherever in determining the course of official action he is called upon to use official judgment and discretion, his exercise of them, in the absence of bad faith, fraud and. gross abuse of discretion, will not be controlled or directed by mandamus. Free Turnpike Co. v. Sandusky County, 1 Ohio St. 149; State ex rel. Anderson v. Holmes County, 17 Ohio St. 608; Lake Co. v. Ashtabula Co., 24 Ohio St. 393, 401; Moses on Mandamus, 78; High Ex. Rem. § 24; United States v. Seaman, 17 How. 225.
The important business confided to the supervision of the defendant is too vast in its consequences to the people of our state to admit of a construction of his powers so narrow as to hold that his judgment or discretion are to take no part in determining his action upon the application of a foreign insurance company for permission to transact its business within the state. His refusal in the case at bar was not a dereliction of duty;. On the contrary, .the highest considerations of public duty and official fidelity called upon him to see to it that the security of our people was not imperiled by his action. He wasp called to the exercise of official judgment and discretion. He exercised them; and as no fraud, bad faith or abuse *109 of discretion intervened, so far as it affects the present proceeding, his decision is final/)

Writ refused.